IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH **KINGDOMSEEKERS@ME.COM; KINGDOMSEEKERS@MAC.COM** THAT ARE STORED AT PREMISES CONTROLLED BY **APPLE INC.** | Case No. 14-mc-17 <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Brian Pickens, after being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by Apple Inc., an electronic mail ("e-mail") provider headquartered at 1 Infinite Loop, Cupertino, CA 95014. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2. I have been employed as a special agent with the Criminal Investigation division of the IRS in Rapid City, South Dakota since July 2012. My job duties include conducting investigations of violations of internal revenue laws, money laundering statutes, and currency reporting requirements. I hold a bachelor's degree in history from the University of California,

Los Angeles and a master's degree in accounting from the University of Montana, Missoula. I have been trained at the Federal Law Enforcement Training Center in the laws of search and seizure and in the use of search warrants in tax-related investigations. I am also a certified public accountant and worked as an IRS Revenue Agent for six years before becoming a special agent.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, I believe there is probable cause to believe that David Ward Astin ("Astin") has committed violations of 18 U.S.C. § 1343, Wire Fraud, and 18 U.S.C. 1956(a)(1)(A)(i), Money Laundering. I believe there is also probable cause to search the information described in Attachment A for evidence of these crimes and fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5. I submit there is probable cause to believe that David Astin used electronic communications, via the e-mail addresses Kingdomseekers@mac.com and Kingdomseekers@me.com, to communicate with and defraud Dr. E. David Blickensderfer ("Blickensderfer") of Rapid City, South Dakota. I am informed by Blickensderfer that in 2012, Astin and Blickensderfer came to an agreement whereby Astin would manage and be responsible for trading in several of Blickensderfer's investment accounts. In sum, Astin used the e-mail addresses to provide false information to Blickensderfer about the balances in the accounts,

2

which, according to Blickensderfer, caused Blickensderfer to make additional payments to Astin and continue funding the accounts. My investigation reveals that records associated with the e-mail addresses Kingdomseekers@mac.com and Kingdomseekers@me.com are stored on premises controlled by Apple, Inc.

6. I interviewed Blickensderfer on October 29, 2013 regarding his relationship with Astin. In the interview, Blickensderfer said that he befriended Astin in 2011 after employing Astin for painting services at his residence. During one of their conversations, Astin mentioned that he was involved in trading on the foreign currency exchange market ("forex"), which is a decentralized market for trading in foreign currencies.

7. Blickensderfer informed me that in February 2012, Astin and Blickensderfer met at a Starbucks coffee shop to discuss Astin's results with respect to forex trading. At the meeting, Astin made representations to Blickensderfer about his forex trading performance, including the assertion that he had earned monthly returns of approximately eight percent over the previous seven to eight years. Astin also told Blickensderfer that he received forex trading advice from an individual named Dan Gaub ("Gaub"), who, according to Astin, was a forex guru who managed millions of dollars in forex trading accounts. Astin told Blickensderfer that Gaub could turn $1,000.00 into $1,000,000.00 in one month by trading in the forex market.

8. Blickensderfer further informed me that following the meeting, Blickensderfer decided to start a forex "venture" with Astin. According to their arrangement, Astin would help Blickensderfer set up a forex account, Blickensderfer would make deposits into the account, and then Astin would access and execute trades in the account on Blickensderfer's behalf. Blickensderfer informed me that he and Astin had discussions about how Astin would be

3

compensated for his investing services. Initially, Blickensderfer and Astin discussed splitting profits by having a "sweep" arrangement whereby money from Blickensderfer's account would be transferred to Astin's account. Blickensderfer stated that he eventually decided to write checks payable to Astin and Astin's kids as "gifts".

9. Blickensderfer further informed me that in April 2012, Astin assisted Blickensderfer in setting up a forex account with an offshore broker called HF Markets Ltd ("HotForex"), which is headquartered in Mauritius. According to records provided me by Blickensderfer, the account, #156161, was established on or about April 16, 2012. Blickensderfer funded the account with approximately $7,500.00 and authorized Astin to execute trades in the account. Shortly after opening the HotForex account, near the end of April 2012, Blickensderfer received notice from HotForex that the accounts of all United States residents would be closed by a certain date. HotForex closed Blickensderfer's account on or about May 4, 2012, resulting in a loss of approximately $5,007.59.

10. Blickensderfer further informed me that after the HotForex account was closed, Astin assisted Blickensderfer in setting up three accounts with GAIN Capital Group LLC ("Forex.com"). The first account, #10868158, was opened on or about May 17, 2012 (the "individual account") and was an individual trading account in Blickensderfer's name. The second account, #10978676, was opened on or about December 6, 2012 and was an Individual Retirement Account in the name of Millennium Trust Company ("Millennium") for the benefit of Blickensderfer. The third account, #10958929, was opened on or about February 11, 2013 and was an Individual Retirement Account in the name of Millennium for the benefit of Blickensderfer. In this affidavit, the two trading accounts that Blickensderfer opened through

Millennium are referred to collectively as the "IRA account". Blickensderfer informed me that Astin was authorized to execute trades in the individual and IRA accounts.

11. Blickensderfer further informed me that he and Astin met approximately once per month, with some of the meetings taking place at Murphy's Pub and Restaurant in Rapid City, South Dakota. At the meetings, Astin would usually provide Blickensderfer with a printed spreadsheet that indicated the purported account balances and monthly return and performance information for the individual and IRA accounts. On several occasions, Astin also provided Blickensderfer with copies of the alleged account statements from Forex.com.

12. I have compared the spreadsheets and alleged account statements Blickensderfer informed me he received from Astin to the account statements I received from Forex.com. My comparison reveals Astin repeatedly misrepresented the true account balances in the individual and IRA accounts to Blickensderfer, concealing losses in the accounts. Astin was responsible for the losses in the accounts, since Blickensderfer stated that Astin was the only person who executed trades in the individual and IRA accounts. Blickensderfer also told me that Astin's representations to him on the spreadsheets and statements were the reason he continued writing checks to Astin and Astin's children, in addition to depositing more money in the individual and IRA accounts.

13. A summary of the comparison between the individual account balance information on Astin's spreadsheets to the individual account balance information provided by

Forex.com is included below:

| Period | Per Forex.com Ending Balance | Per Astin Ending Balance | Difference |
|---|---:|---:|---:|
| 4/30/12 5:00 pm - 5/31/12 5:00 pm | $984.70 | | |
| 5/31/12 5:00 pm - 6/29/12 5:00 pm | $2,515.31 | $2,706.31 | $191.00 |
| 6/29/12 5:00 pm - 7/31/12 5:00 pm | $1,143.70 | $3,013.13 | $1,869.43 |
| 7/31/12 5:00 pm - 8/31/12 5:00 pm | $1,049.92 | $3,048.16 | $1,998.24 |
| 8/31/12 5:00 pm - 9/28/12 5:00 pm | $2,068.15 | $6,241.09 | $4,172.94 |
| 9/28/12 5:00 pm - 10/31/12 5:00 pm | $6,041.26 | $17,441.77 | $11,400.51 |
| 10/31/12 5:00 pm - 11/30/12 5:00 pm | $10,686.43 | $35,987.51 | $25,301.08 |
| 11/30/12 5:00 pm - 12/31/12 5:00 pm | $36,333.29 | $68,505.91 | $32,172.62 |
| 12/31/12 5:00 pm - 1/31/13 5:00 pm | $103,009.36 | $127,176.14 | $24,166.78 |
| 1/31/13 5:00 pm - 2/28/13 5:00 pm | $232,766.08 | $232,766.08 | 0.00 |
| 2/28/13 5:00 pm - 3/29/13 5:00 pm | $160,901.90 | $247,243.18 | $86,341.28 |
| 3/29/13 5:00 pm - 4/30/13 5:00 pm | $82,549.31 | $295,129.84 | $212,580.53 |
| 4/30/13 5:00 pm - 5/31/13 5:00 pm | $87,082.09 | $404,996.35 | $317,914.26 |
| 5/31/13 5:00 pm - 6/28/13 5:00 pm | $126,013.86 | $515,709.02 | $389,695.16 |
| 6/28/13 5:00 pm - 7/31/13 5:00 pm | $197,317.76 | $605,915.24 | $408,597.48 |

14. A summary of the comparison between the IRA account balance information on Astin's spreadsheets to the IRA account balance information provided by Forex.com is included below:

| Period | Per Forex.com Ending Balance | Per Astin Ending Balance | Difference |
|---|---:|---:|---:|
| 12/6/12 - 12/31/12 | $18,508.02 | $25,165.13 | $6,657.11 |
| 1/1/13 - 1/31/13 | $29,547.86 | $36,280.01 | $6,732.15 |
| 1/31/13 5:00 pm - 2/28/13 5:00 pm | $127,066.41 | $133,798.52 | $6,732.11 |
| 2/28/13 5:00 pm - 3/29/13 5:00 pm | $98,898.51 | $141,807.43 | $42,908.92 |
| 3/29/13 5:00 pm - 4/30/13 5:00 pm | $60,612.98 | $151,171.83 | $90,558.85 |
| 4/30/13 5:00 pm - 5/31/13 5:00 pm | $75,838.45 | $211,159.54 | $135,321.09 |
| 5/31/13 5:00 pm - 6/28/13 5:00 pm | $94,961.85 | $277,423.12 | $182,461.27 |
| 6/28/13 5:00 pm - 7/31/13 5:00 pm | $81,789.90 | $291,541.25 | $209,751.35 |

15. Blickensderfer informed me that on four occasions, Astin provided him with account statements, purportedly from Forex.com, for the individual and IRA accounts. The

statements that Astin provided to Blickensderfer for the individual account were for the periods ending September 28, 2012, December 31, 2012, and June 28, 2013 and represented that the balances in the account were $6,241.09, $68,505.91, $515,709.02, respectively. The statement that Astin provided to Blickensderfer for the IRA account was for the period ending June 28, 2013 and represented that the balance in the account was $277,423.12. The ending account balances on the statements provided by Astin do not match the ending account balances on the statements provided by Forex.com for the individual and IRA accounts for the same time periods. In addition, the account statements provided by Astin do not include any of the trading detail, such as dates, amounts, and gains or losses on individual trades for each trading period, whereas the account statements provided by Forex.com include detail on individual trades. Furthermore, on the account statement provided by Astin for the period ending June 28, 2013, the "Roll Amount" of $120.51, which represents interest charged for trading, was omitted in the calculation of the ending balance. In other words, the subtotals provided on Astin's account statement do not reconcile to the ending balance provided on the statement. The account statements Astin provided to Blickensderfer for the periods ending September 28, 2012, December 31, 2012, and June 28, 2013, overstated the individual account balances by approximately $4,172.94, $32,172.62, and $389,695.16, respectively. The account statement Astin provided to Blickensderfer for the period ending June 28, 2013 overstated the IRA account balance by approximately $182,461.27.

16. In an e-mail sent to Blickensderfer on August 9, 2012, which Blickensderfer provided me, the sender stated that the individual account had ending balances in June of $2,706.31 and July of $3,013.13. The e-mail was sent from Kingdomseekers@me.com. The ending balances as provided by the sender for June and July 2012 do not match the ending

7

balances provided by Forex.com for the same time periods. When compared to the ending individual account balances provided by Forex.com for June 29, 2012 and July 31, 2012, the e-mail reported an overstatement of the individual account balances by $191.00 and $1,869.43, respectively.

17. In documentation provided me by Blickensderfer, a text message from the telephone number (605) 431-4281 was sent to Blickensderfer on June 12, 2013 reporting that the May balance in the IRA account was $211,159.54. In an interview with IRS special agents on September 16, 2012, Astin said that his cellular phone number was (605) 431-4281. When compared to the ending IRA account balance for May 31, 2013 as provided by Forex.com, the text message reported an overstatement of the IRA account balance by approximately $135,321.09.

18. From April 6, 2012 through August 6, 2013, Blickensderfer paid nine checks (summarized below) to Astin and Astin's children, totaling $75,500.00, which Blickensderfer informed me were related to the forex arrangement with Astin. The checks were either cashed by Astin or deposited into Astin's bank account at Wells Fargo Bank, which I know from my review of various bank records.

| Date of check | Amount | Check # | Payable to |
| --- | --- | --- | --- |
| 4/06/12 | $4,500.00 | 7166 | David Astin |
| 4/19/12 | $8,500.00 | 7170 | David Astin |
| 10/18/12 | $13,500.00 | 7256 | Joy Astin (Astin's daughter) |
| 1/25/13 | $13,500.00 | 7304 | David Astin |
| 3/14/13 | $5,000.00 | 7340 | Joy Astin (Astin's daughter) |
| 4/16/13 | $8,500.00 | 7349 | Joy Astin (Astin's daughter) |
| 6/21/13 | $8,500.00 | 1001 | Ward David Astin (Astin's son) |
| 7/01/13 | $5,000.00 | 1002 | Ward David Astin (Astin's son) |
| 8/06/13 | $8,500.00 | 1003 | Nathaniel Astin (Astin's son) |

19. Blickensderfer informed me Astin's representations on the spreadsheets and statements were the reason that he continued writing checks to Astin and Astin's children, in addition to depositing more money in the individual and IRA accounts. Blickensderfer would fund only the individual and IRA accounts if Astin reported that the accounts were profitable, which, according to Blickensderfer, was a condition that Astin was aware of. Whenever Blickensderfer asked Astin if there was going to be an upcoming deposit into the accounts, Astin knew that if he replied "yes" that Blickensderfer would interpret that to mean the accounts had been profitable. Once Astin confirmed that there should be an upcoming deposit, Blickensderfer would either wire money or charge his credit card to fund the IRA and individual accounts.

20. In total, Blickensderfer deposited (gross deposits less transfers between accounts) approximately $787,647.58 into the forex accounts. Total withdrawals and ending balances were $353,572.94. By subtracting withdrawals and ending balances from deposits, the net loss from forex trading in Blickensderfer's accounts was approximately $434,074.64.

21. As of the close of trading on July 31, 2013, which is the date of the most recent spreadsheet that Astin provided to Blickensderfer, Astin reported that the combined balances in the individual and IRA accounts were $897,456.49 ($605,915.24 for the individual account and $291,541.25 for the IRA account). The actual balances in the accounts on July 31, 2013, as verified by Forex.com, totaled $279,107.66 ($197,317.76 for the individual account and $81,789.90 for the IRA account).

22. In addition to managing investment money for Blickensderfer, I have detected indications that Astin may have invested money for other individuals prior to the agreement with Blickensderfer. In 2010 and 2011, three checks totaling $7,500.00 were deposited into Astin's bank account at Wells Fargo from an individual named Zach Lautenschlager ("Lautenschlager") which included the word "gift" on the memo line. The language on Lautenschlager's checks is similar to the language on some of the checks that Blickensderfer wrote to Astin and Astin's children. On October 2, 2013, I interviewed one of Astin's friends, John Ligtenberg, who said that Astin had invested money for Lautenschlager.

23. In response to a federal grand jury subpoena, Blickensderfer provided numerous copies of e-mails he had received from "David & Raquel Astin" from the e-mail address Kingdomseekers@me.com. One of the e-mails, for example, is dated November 4, 2011, and includes an invoice from "David Astin" at 13955 Murphy Road, Hermosa SD 57744. In an interview with IRS special agents on September 16, 2012, Astin said that his wife's name is Raquel and he lives at 13955 Murphy Road, Hermosa SD 57744.

24. As previously discussed, Blickensderfer provided an e-mail dated August 9, 2012, which was sent from "David & Raquel Astin" at Kingdomseekers@me.com. In the e-mail, the sender overstated the individual account balances for June and July 2012 by $191.00 and $1,869.43, respectively.

25. In response to a subpoena, Forex.com provided documents indicating that Astin applied for a Forex.com account on or about May 4, 2012. On the application, Astin lists Kingdomseekers@mac.com as his e-mail address and 13955 Murphy Road, Hermosa SD 57744 as his address. Goran Stanic ("Stanic"), who works in the legal department at Forex.com, stated

that individuals are required to provide a social security number to open an account with the U.S. division of Forex.com. Stanic stated that the account that Astin applied for was not opened as Astin stated he did not have a social security number.

26. Forex.com also provided a recorded telephone conversation from April 26, 2013, with an individual who called Forex.com from telephone number (605) 431-4281 and identified himself as "David Blickensderfer". As previously mentioned, Astin stated to IRS special agents that his telephone number was (605) 431-4281. In the telephone call with Forex.com, the individual requested that Forex.com send an account transfer form to the e-mail address Kingdomseekers@mac.com. While still on the phone with Forex.com, the individual confirmed he had received the form e-mailed to Kingdomseekers@mac.com.

27. In my training and experience, I have learned that Apple Inc. provides a variety of on-line services, including e-mail access, to the general public. Apple Inc. allows subscribers to obtain e-mail accounts at the domain names me.com and mac.com, like the e-mail accounts listed in Attachment A. Subscribers obtain an account by registering with Apple Inc. During the registration process, Apple Inc. asks subscribers to provide basic personal information. Therefore, the computers of Apple Inc. are likely to contain stored electronic communications (including retrieved and un-retrieved e-mail for Apple Inc. subscribers) and information concerning subscribers and their use of Apple Inc. services, such as account access information, e-mail transaction information, and account application information.

28. In general, an e-mail that is sent to an Apple Inc. subscriber is stored in the subscriber's "mail box" on Apple Inc. servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Apple Inc.'s servers

indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Apple Inc.'s servers for a certain period of time.

29.     When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Apple Inc.'s servers, and then transmitted to its end destination. Apple Inc. often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Apple Inc. server, the e-mail can remain on the system indefinitely. Even if the sender deletes the e-mail, it may continue to be available on Apple Inc.'s servers for a certain period of time.

30.     A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send it, that message may also be saved by Apple Inc. but may not include all of these categories of data.

31.     An Apple Inc. subscriber can also store files, including e-mails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by Apple Inc.

32.     Subscribers to Apple Inc. might not store on their home computers copies of the e-mails stored in their Apple Inc. account. This is particularly true when they access their Apple Inc. account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

33.     In general, e-mail providers like Apple Inc. ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This

information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

34. E-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Apple Inc.'s website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

35. In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

36. In my training and experience I have learned that evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

37. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple Inc. to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

38. Based on the foregoing, I request that the Court issue the proposed search warrant.

39. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

40. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## APPLICATION FOR ORDER COMMANDING APPLE INC. NOT TO NOTIFY ANY PERSON OF THE EXISTENCE OF THE WARRANT

41.     The United States requests that the Court order Apple Inc. not to notify any person (including the subscribers or customers of the account(s) listed in the warrant of the existence of the attached warrant until further order of the Court.

42.     Apple Inc. is a provider of an electronic communication service, as defined in 18 U.S.C. § 2510(15), and/or a remote computer service, as defined in 18 U.S.C. § 2711(2). Pursuant to 18 U.S.C. § 2703, the United States prospectively obtained the attached warrant, which requires Apple Inc. to disclose certain records and information to the United States. This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *Id.*

43.     In this case, such an order would be appropriate because notification of the existence of the attached warrant may seriously jeopardize the investigation, including giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, or notify confederates. *See* 18 U.S.C. §§ 2705(b)(3) and (5). Some of the evidence in this investigation is stored electronically. If alerted to the warrant, the subjects under investigation could destroy that evidence, including information saved to their personal computers.

44.     WHEREFORE, the United States respectfully requests that the Court grant the attached Order directing Apple Inc. not to disclose the existence or content of the attached warrant, except that Apple Inc. may disclose the attached warrant to an attorney for Apple Inc. for the purpose of obtaining legal advice.

15

## REQUEST FOR SEALING

45.     The United States further requests that the Court order that this application and any resulting order be sealed until further order of the Court. As explained above, these documents discuss an ongoing criminal investigation that is not public. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Executed on 2-13-14.

Respectfully submitted,

_____
Brian Pickens
Special Agent
IRS-CI


Subscribed and sworn to before me on Feb. 13, 2014

_____
UNITED STATES MAGISTRATE JUDGE